FEDERAL DEPOSIT INSURANCE
CORPORATION,
Plaintiff-Appellant,

v.

Alton E. JONES; Oscar E. Jones; Jill
G. Jones, Defendants-Appellees.

Alton E. JONES, Plaintiff-Appellee,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION, Defendant-Appellant.
(Two Cases)

Nos. 86–3175, 87–3046 and 87–3049.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 5, 1987.

Decided May 5, 1988.

John Randolph Pelzer, Charleston, S.C.,
(Dennis Christensen, Sullivans Island, S.C.,

Pelzer & Associates, P.A., Charleston, S.C., John Francis Elmore, Federal Deposit Ins. Corp., on brief), for plaintiff-appellant.

George Richardson Wieters (John W. Minor, Jr., Hughes & Wieters, P.A., Hilton Head Island, S.C., on brief), for defendants-appellees.

Before RUSSELL, WILKINSON, and WILKINS, Circuit Judges.

DONALD RUSSELL, Circuit Judge.

Introductory to a discussion of the actual issues posed in the appeal of Federal Deposit Insurance Corporation's (hereafter "FDIC" or "creditor") motions, we take note of the fact that in one form or another, this case has engaged the attention of federal courts for some eleven years. This extended delay in resolution has not been due to the complexity of the legal issues involved or the development of an extensive factual record. The case is a simple one for collection of a debt, which debt with accumulated interest was about a million dollars at the time of the events involved in the present proceedings. The debtor, Alton E. Jones and Oscar E. Jones, father and son, and certain of their wholly owned subsidiaries (hereafter referred to either as "debtor" or "Jones"), has never denied this indebtedness at any time during the negotiations or litigation. The delay prior to the filing of this latest action was largely the result of the debtor's efforts to secure, either by an agreement or by a judicial decision, a compromise settlement of the debt. During its life, this matter has involved many hearings before three district judges, with different counsel representing the debtor at the various steps. The creditor has filed during this time at least two actions to recover on its indebtedness as well as an action in foreclosure. The first action was begun in 1976 but was dismissed when a compromise settlement was agreed on in 1979. The foreclosure action was filed between the settlement of the first action and the filing of the next action. This third action in the litigation between the parties was filed by the debtor against the creditor for specific performance of an alleged compromise settlement

of the indebtedness reached allegedly in late 1981 after default by the debtor on his 1979 compromise agreement. This action, begun in early 1983, is hereafter referred to as "Jones I." Following the district court decision in that case and its affirmance in this court, the creditor sought to enforce the confession of judgment agreed to by the debtor in the 1979 settlement and reaffirmed in the decision in Jones I. In that connection it gave notice of the taking of the debtor's deposition in supplementary proceedings. With that action by the creditor, the debtor filed an action against the creditor, seeking the invalidation of the confession of judgment. That is the action, referred to hereafter as "Jones II," now before us on this appeal. In this action, the debtor sought an injunction and the creditor responded with its counter motions for an injunction and for summary judgment. The district court dismissed all motions, and the creditor has appealed the denial of its motions. We reverse.

After Jones II had been begun, FDIC filed another action against Jones and the wife of one of the Jones, Jill G. Jones. In this action, FDIC sought the voidance of certain conveyances to Jill G. Jones and the recovery from her of the value of "the assets previously conveyed to her insofar as this is determined herein." In connection with that action, FDIC filed in the appropriate offices a *lis pendens*. The defendants-debtors immediately moved to dissolve the *lis pendens* in that action. After hearings, that motion was granted. FDIC appealed the granting of the motion dissolving the *lis pendens*. That appeal has been consolidated with the appeal in Jones II and will be resolved herein. We reverse that decision, too.

We begin by reviewing the background of the litigation. The background is somewhat extensive but is essential to an understanding of the issues. After sketching that background, we review first the appeal in the action by Jones against FDIC and then the appeal in the suit of FDIC against Jones, *et al.*

## I.

There is little dispute about the relevant facts since these have been exposed in earlier aspects of this case. Nor can there be much doubt about the applicable law. The indebtedness involved in the proceeding originated in various loans secured in the early 70's by Jones from the American Bank & Trust Company, a banking corporation organized and operating under the laws of South Carolina (hereafter Bank) with its deposits protected by FDIC. This indebtedness was partially secured by mortgages on real estate in a number of South Carolina counties. When the Bank became insolvent in 1974, most, if not all, of its assets, including the Jones indebtedness, were assigned and transferred for value to FDIC. Jones having defaulted on his indebtedness, the FDIC filed suit on the debt and began foreclosure proceedings of the real estate mortgages securing the indebtedness on June 5, 1976.

Jones asserted no defense to these actions but was anxious to work out a compromise settlement of his indebtedness to avoid the entry of a judgment against him which would be detrimental to his business interests. He accordingly began urgent negotiations to this end. In those negotiations, Jones submitted an offer of settlement to the FDIC. Under this offer, Jones was to make payment of "certain sums of money ... [to] be paid to the FDIC on or before specific dates"[1] and, upon the payment of all such sums, the indebtedness of Jones to the FDIC was to be extinguished. The offer also provided that, in event of default, the FDIC could enter judgment for the full balance due and could foreclose, without objection by Jones, the mortgages securing the debt. Along with the proposal, Jones submitted "Confession of Judgment [in favor of the FDIC] for all of the principal, interest and advances in the sum of $905,087.00 for filing in event of a default and further agreed that upon failure to meet payment schedule [Jones] would consent to the entry of a decree of fore-

closure and sale on the mortgages held by the FDIC." This offer was dated March 2, 1979. It was clearly understood that acceptance of the offer could not be agreed to by the then local representative of the FDIC but required the approval of the Board of Directors of the FDIC in Washington. The offer was thereafter accepted and approved by the Board of Directors of the FDIC and the offer thereby ripened into a final, binding contract.

Jones made the payments provided in the 1979 agreement until early 1981,[2] when default occurred. Jones, however, requested the FDIC not to file immediately the "confession of judgment" until negotiations could be had on a possible modification of the 1979 agreement. These negotiations began between Jones, represented by his counsel, James Quackenbush, and the FDIC, represented by Francis G. Banffy, its local liquidator, assisted by FDIC's local counsel, Pelzer and Chard. While the negotiations were proceeding and before any agreement on the local level could be arrived at, the parties made a separate and independent agreement that, because of the deterioration occurring in the secured property, immediate foreclosure proceedings should begin even while the negotiations for a modification of the 1979 agreement were proceeding and that, as an accommodation to Jones, the FDIC would forego taking in those proceedings a default judgment against Jones in return for Jones' agreement not to use such failure as a defense to the confession of judgment given the FDIC by Jones under the 1979 settlement agreement. Since this agreement is central to the issue raised by Jones in his suit against FDIC, we describe in some detail the agreement.

The agreement which was annexed as an exhibit to FDIC's answer and counterclaim in the present suit began with two preambles, agreed to by the parties. The first was to the effect that "the parties hereto have commenced negotiations for the modification of said confession of judgment

---

1. These sums to be paid in compromise settlement were in the total amount of $664,570.

2. Payments as received from the Jones under this agreement were duly credited on the Confession of Judgment.

agreement." Since this agreement was submitted on October 26, 1981, that being the date Jones delivered the signed agreement to the representative of FDIC, this statement is important in demonstrating that as of that date the parties had not gotten beyond negotiating for a settlement and definitely had not agreed on a settlement. The second preamble was a statement that "the parties hereto recognize and acknowledge that all parties would benefit by the foreclosure of the mortgages...." In the agreement itself, the parties agreed that the "Federal Deposit Insurance Corporation, with the knowledge and approval of [Jones] commenced foreclosure proceedings...." However, in the next paragraph, the agreement states the reason for the agreement: "That a deficiency judgment in said foreclosure actions would be of serious detriment to the financial and professional interests of [Jones]...." It then declares that "[Jones] desire[s] that Federal Deposit Insurance Corporation waive its rights to a deficiency in this action" and offers in return:

"4. That in the event Federal Deposit Insurance Corporation elects to file the aforesaid confession of judgment pursuant to the terms of the confession of judgment agreement or any other agreement reached by the parties, and avail itself of all remedies provided by law to a judgment creditor, Fairdale Builders, Inc., Oscar E. Jones, and Alton E. Jones agree that they will not raise a defense to such proceedings based upon FDIC's election to waive its rights to a deficiency judgment in this foreclosure proceeding.

"5. Fairdale Builders, Inc., Oscar E. Jones, and Alton E. Jones, further agree as follows:

"(a) That FDIC may proceed with the foreclosure of the mortgages enumerated in Exhibit A attached hereto;

"(b) That FDIC may waive its rights to deficiency judgments on said mortgages without prejudicing its rights to later file the confession of judgment executed by Fairdale Builders, Inc., Oscar E. Jones, and Alton E. Jones."

On the basis of this offer of Jones which was accepted by FDIC, the latter, which had discontinued the foreclosure proceedings unless and until the parties could agree on the waiver agreement of October 26, 1981, proceeded with its foreclosure action and took a decree of foreclosure on January 14, 1982 without requesting a deficiency judgment in that proceeding against Jones, as requested by Jones.

During the time when the October 26, 1981 agreement was being agreed upon, the negotiations for a compromise settlement, as that agreement stated, had been in progress. Jones had, through his counsel, submitted an initial offer of settlement but Banffy was unwilling to submit the offer to Washington for consideration and approval by the Board of Directors of the FDIC. Jones then requested an interview with Banffy and on June 2, 1981, a meeting of Banffy with Jones, both parties being represented by counsel, was held in order to afford Jones an opportunity to make another offer of compromise. Jones at the time "agreed to submit to FDIC a settlement offer structured" generally as stated therein.[3] The settlement offer, however, was to be reduced to a "written offer of settlement" "acceptable on its face to [Banffy]." The actual drafting of the proposed settlement offer with its various provisions was left to the attorneys of the respective parties to work out. When a draft had been formalized, it was clearly understood by Jones and his counsel that the settlement offer, when finally drafted and found by Banffy to be acceptable, was to be transmitted by him (Banffy) to Washington with his recommendation for final approval by the Board of Directors.[4]

---

**3.** Banffy prepared after the meeting an inter-office memorandum summarizing the discussion. This memorandum was introduced in evidence by Jones as his exhibit. App. 868–869

**4.** In his brief in this court in the appeal of Jones I, Jones said that he was advised by Banffy at the meeting that "if this agreement were to be submitted in the form of an offer to the local FDIC office, it would be accepted favorably and forwarded to the Board of Directors of FDIC in Washington, D.C. for final approval. Banffy advised Jones that approval in Washington by the FDIC was a 'mere formality' and that the

Negotiations between the attorneys in the drafting of a formal "settlement offer" proceeded for several months, resulting in the exchange of at least four distinct drafts of a proposed agreement between the parties. Finally in December, 1981, a draft was executed by Jones and submitted to Banffy. This agreement was referred to in Jones' complaint in Jones I as executed in "the fall of 1981" and later at trial it was identified as the "December agreement" and as the "final and binding" agreement of settlement between the parties.[5] This draft was forwarded to the FDIC in Washington for approval within a week or so of its submission with Banffy's recommendation for approval. As a part of this submission Jones had included as an essential part of his offer his financial statement showing a net worth of $247,961.19. The FDIC in Washington, after receipt of the proposed agreement and the supporting financial statement, requested a fuller statement of financial worth and included a standard form it used for this purpose, to be signed by Jones. In this new financial statement, Jones stated his net worth at $578,140.00. The substantial discrepancy of almost $300,000 between Jones' financial status as stated in the two statements arose out of the valuation of the Jones' interest in the Hilton Head Island Realty. In the first statement, the value of the Jones' holdings in Hilton Island Realty was stated as $300,000; in his second statement, *executed two months later*, the value of such holdings was declared to be $700,000. Because of these disturbing differences in estimates of value made within two months of each other, the FDIC turned down the offer of Jones and so notified him of such fact on July 27, 1982.

Some five months after Jones had been advised that his offer of settlement had been disapproved by the FDIC, Jones filed an action in early 1983 to compel specific performance by the FDIC of what he later characterized as the contract of June 2, 1981, even though the written contract was not submitted until late December, 1981. In the trial of this action the agreement of October, 1981, in which Jones agreed not to assert the failure of the FDIC to seek a deficiency judgment in the foreclosure action as a defense to the confession of judgment given the FDIC in March 1979, was alleged as a part of Jones' claim of estoppel against the FDIC.

The district judge, at the conclusion of a trial of this case (Jones I) before him without a jury, made his findings of fact and conclusions of law. In these findings and conclusions, he found in the beginning that there was *"not* a legally binding agreement" between the parties. The district judge reached this conclusion because "both parties understood that there was something more to be done before they would be bound, to wit: approval of the proposed agreement by the Board [of Directors of FDIC]." He cited in support our ruling in *U.S. v. Newport News Shipbuilding & Dry Dock Co.*, 571 F.2d 1283, 1286 (4th Cir.1978), *cert. denied*, 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189. He found that case almost identical with this case.[6] As summarized by the district judge, "the Navy [in that case] filed suit on a contract against a shipbuilder. The parties attempted to negotiate a settlement, both parties knowing that the negotiator for the Navy had no authority to bind it and that the Deputy Secretary of Defense must approve any settlements. The negotiator for the Navy and the shipbuilder reached a tenta-

Board had never failed to accept the recommendation of its regional representative."

This description was in accordance with that of the local representative of the FDIC present at the meeting with this exception: They denied that Banffy had said that his recommendations were always accepted or that the approval by the FDIC Board of Directors was a mere formality. There was direct testimony from FDIC that not all recommendations of local FDIC representatives were approved in Washington, and this was not disputed.

5. At trial in the district court in Jones I, Jones' counsel described the "final agreement" as "the December 1, 1981 agreement." Vol. I, Supp. App., p. 676.

6. The same result would be reached under South Carolina law. *Bugg v. Bugg*, 272 S.C. 122, 125–56, 249 S.E.2d 505 (1978); *Reed v. Boykin*, 282 S.C. 614, 320 S.E.2d 68, 69 (S.C.Ct.App. 1984).

tive oral agreement, but it was not given final approval by the Deputy Secretary of Defense, to whom the power of final approval was delegated. The Fourth Circuit held, since it was understood that the tentative agreement was to be reduced to a written settlement offer, that it was not a binding agreement." The district judge in his opinion also disposed of any claims of estoppel against the FDIC by denying the existence of a contract of settlement between the parties.[7] He said on this point that "[i]n an effort to dispose of the entire controversy between the parties at one time, the court has repeatedly invited the plaintiff to amend his complaint to clearly allege a cause of action based on estoppel[8] and to supplement the record to show [to] the court the damages sustained by Jones as a result of his reliance on the alleged promises of FDIC if it found that there had been such promises. The plaintiff has chosen not to do so, and, on June 3, 1985, he informed the court that 'he wanted the case to be decided on the present record.'" The district judge accordingly made his decision on that basis. He then dismissed the claim for failure of any proof of prejudice or damage. He also made as a specific finding of fact and conclusion of law that "Banffy was without authority to accept compromise of claims of the FDIC such as the proposed agreement. *Moreover, Jones knew of this limit on his [Banffy's] authority.*" (Italics added) He found as a ground for his conclusion that the Board of Directors had never approved the settlement agreement.

After the district judge had filed his findings of fact and conclusions of law in Jones I, Jones entered a "Motion to Alter or Amend Judgment, or, in the Alternative, for a New Trial." Among the changes he sought in this motion are the following:

1. He asked that in the finding in connection with the foreclosure of the mortgages the following be included:

That Jones agreed to acquiesce in foreclosure of the properties and not to contest foreclosure in any way. *That subsequently Jones, in fact, signed an agreement with the Defendant not to contest the foreclosures provided that the FDIC would waive any deficiency judgment. (Italics added)*

2. He requested the deletion from the findings of fact this statement:

They [meaning the parties] did not intend to be bound until the Board approved the proposed agreement.

3. He sought to substitute for the language in the conclusion of law that Banffy lacked authority to bind the FDIC this:

Under the circumstances of this case, the FDIC may be bound by the acts and representations of its agent, Banffy, who acted with the apparent authority of the FDIC. When the FDIC acts in its corporate capacity, which it did with regard to Jones, it may be bound pursuant to the general rules governing principal and agent.

Earlier at the hearing before him on Jones' counsel's motion to amend his decision, the district judge seemed to find the position of Jones at the hearing on the motion to "Amend or Alter" inconsistent with the positions he had taken during the trial as shown by the record. He commented that "the tune you [meaning Jones' counsel] sing here today is 100 degrees off of what you said when I was here before." He went on to declare: "I think that the offices of this court are being abused by the plaintiff [Jones]. I possibly should not say I think that. Maybe I should say I suspect that." He then dismissed the motion in the entirety.

---

**7.** Rule 8(c), Fed.R.Civ.P. requires claim of estoppel to be affirmatively plead.

**8.** The actual language of the district judge at trial was, addressing Jones' counsel in particular:

The pleadings in this case may be a little bit limited. I'm not sure to the extent, if any, that they are limited, but it would be my hope

that to the extent that they are limited, that we would ultimately broaden them to the point where we could bring this matter to a conclusion, if in fact, it can be concluded in a court of law. Because I think it's been dragging along enough, and the longer it drags on then unnecessary injury is caused to persons and the F.D.I.C. as well.

Jones also moved in the alternative "to reopen this case, which was tried before the Court, for the purpose of receiving further evidence." This motion was denied because, as the district court established by the admission of Jones' counsel, that the district judge stated at trial that if Jones had any evidence of "detriment" he would reopen the case in order to allow the testimony and had even gone to the extreme of entreating counsel to produce any such evidence, if he had any. To all this, Jones' counsel responded, "I don't want to do it." Later, after trial and before the district judge had filed his findings of fact and conclusions of law, he inquired again specifically at a conference call of counsel for both sides whether Jones wished to offer any other evidence to show reliance on his part. When Jones' counsel answered in the negative, the district judge persisted, "[t]hat's your final decision?" Jones' counsel answered in the affirmative. The court thereupon denied the motion.

Jones appealed. While he listed four exceptions, his argument both in brief and orally in this court centered on these two contentions:

(1) The district court erred in not finding that FDIC's agent, acting within his apparent authority but not within his actual authority, had agreed to the 1981 settlement, which thereby became an enforceable contract for which Jones was entitled to specific performance. Incident to this was the district court error in finding that the FDIC "was not bound by acts of its agents acting with apparent authority."

(2) The district court erred in not finding the FDIC equitably estopped to deny that there was a 1981 contract in view of the evidence that Jones had suffered detriment in relying upon the representations of the FDIC agents, since he had executed the waiver agreement of October 26, 1981 in which he waived any right to contest the confessions of judgment in consideration of the waiver by FDIC of a deficiency judgment in the foreclosure action on the basis of such representation.

We resolved this appeal by an unpublished opinion on April 15, 1986. In that opinion we disposed of all Jones' contentions against him. On the estoppel theory, we said:

Although much of the law involving estopping government agencies is uncertain, all courts agree that a party must make out the traditional elements of an estoppel claim before estopping the government, *see Heckler v. Community Health Services of Crawford County, Inc.*, [467] U.S. [51], 81 L.Ed.2d 42, 104 S.Ct. 2218 (1984); *West Augusta Development Corp. v. Giuffrida*, 717 F.2d 139 (4th Cir.1983), and in this case Jones has not made out a traditional claim of estoppel. First, Jones was a knowledgeable businessman whose earlier 1979 settlement agreement with the FDIC did not become final until the FDIC board accepted it. Furthermore, even though Banffy's June 1981 statement that board approval would be almost automatic may have been misleading, implicit within it was the requirement that only the FDIC board could accept Jones' offer and enter into a binding agreement. Consequently, this was not a representation that Jones could have reasonably relied upon, and as a result Jones cannot make out a claim of estoppel.

On the lack of authority of Banffy to bind the FDIC to any June, 1981 contract, we declared:

*Second, although Jones could not have reasonably relied on Banffy's statement on its face*, he also cannot make out a traditional claim of estoppel because the trial court found that Jones knew that Banffy did not have the authority to compromise claims like the one against Jones. *See Malcak v. Westchester Park Dist.*, 754 F.2d 239, 245 (7th Cir.1985). Of course, the trial judge's finding that Jones knew of Banffy's lack of authority also adequately supports the trial court's finding that the FDIC and Jones never reached an actual contract in 1981. (Italics added)

After this decision, the FDIC proceeded to take steps to collect its confession of

judgment by resorting to supplementary proceedings in which it served a *subpoena duces tecum* on Jones for the purpose of inquiring into his properties. It was at this point that Jones, now again with new counsel, began this action against FDIC on June 5, 1986. In this new action, Jones II, which is the action now before the court, Jones contended for the first time that the decree and sale under foreclosure entered on January 14, 1982, in which the FDIC had waived any right to a deficiency judgment, operated to satisfy fully all indebtedness of Jones to the FDIC, despite the fact that at least some of Jones' indebtedness was not covered by any of the mortgages foreclosed. Jones further alleged in this complaint that the foreclosure decree was entered by Judge Blatt in January 14, 1982, and this decree found that the amount then due on Jones' indebtedness to the FDIC was $1,018,267.22, plus attorneys' fees of $7,500.00. In this decree the district court recited that FDIC had waived a deficiency judgment in the action. The complaint of Jones averred that sale of the property mortgaged was duly made at public auction by the United States Marshal and "the proceeds of such sale have been paid to FDIC." The complaint, however, made no mention of Jones' agreement of October, 1981, under which the FDIC had waived taking a deficiency judgment against Jones at that time in return for the agreement by Jones that he would not raise the very claim he was now asserting in this action.

The FDIC answered the complaint in this action, pleading three defenses: (1) It set up the agreement of October, 1981, executed by Jones in which he expressly waived the very claim he now asserts; (2) it alleged estoppel against Jones, stating that, in reliance on Jones' agreement, it forewent securing a deficiency judgment; (3) it set up a plea of *res judicata* based on the decision in Jones I. It also filed a counterclaim.

Both parties filed motions immediately after joinder of issue. Jones sought by his motion a preliminary injunction staying any action by the FDIC to collect on its confession of judgment by Jones held by it and staying any deposition of Jones pending determination of the action. FDIC in turn filed a motion for injunctive relief "prohibiting plaintiff Alton E. Jones from relitigating the claim in the above captioned matter which has been tried or could have been tried and determined in this court, [*i.e.*, Jones I]...." This motion was based on the full record in Jones I, which was filed as an exhibit to the motion, and certain records in this case. FDIC filed, too, a motion for summary judgment on the ground that "there [was] no material issue of material fact" and that the FDIC is "entitled to judgment as a matter of law."

The district judge, after several hearings in which counsel for Jones made various oral charges of alleged fraud by FDIC on the court in Jones I, denied all motions for injunctive relief until, as he said, he had had a full review of all the proceedings between the parties. It is from this denial that FDIC has appealed.

While the case instituted by Jones was pending, the FDIC had filed an action against the two Jones and Jill G. Jones, the wife of Alton E. Jones to declare certain conveyances to Jill G. Jones made "with the actual intent to hinder, delay and defraud Plaintiff (FDIC) in the collection of its debts" and asked that the conveyances be voided. The FDIC filed a *lis pendens* covering the property involved in the conveyances in the proper public records. The defendants moved to set aside such *lis pendens*. In a written order, the district court granted the motion of the defendants and dissolved the *lis pendens*. The FDIC has also appealed this order.

By motion and order the appeals by the FDIC from the denial of its motion in the suit brought by Jones (Jones II) and the granting of the motion dissolving the *lis pendens* in the suit filed by the FDIC, were consolidated for appeal and were heard together by us. We proceed to decide both appeals, in separate sections, beginning with FDIC's motions for injunctive relief and for summary judgment in the action brought by Jones (Jones II).

## II.

We address, first, the appeal by the FDIC from the denial of its motions in the

suit filed against it by Jones. We begin our consideration of such appeal with a precise identification of Jones' cause of action as stated in his complaint in this action. Jones seeks in his action a judgment that his confession of judgment and his indebtedness to FDIC had been satisfied by the entry on January 14, 1982 of the decree in the foreclosure proceeding instituted by FDIC to foreclose the mortgages securing the indebtedness due FDIC by him. This claim is premised on the failure of FDIC in the decree of foreclosure in that proceeding to request and secure a deficiency judgment for the balance due on its indebtedness against Jones. He contended such failure under the law of South Carolina, nothing more appearing, worked a relinquishment by FDIC of any "right to pursue assets [in satisfaction of its debt] above those covered by the mortgage." *See Sellars v. First Colonial Corp.*, 276 S.C. 548, 280 S.E.2d 805 (1981). Jones' prayer for judgment was for an injunction requiring the FDIC "to cancel, satisfy or release of record ... Confession of Judgment against Jones in favor of FDIC dated December 18, 1978" and enjoining it "from levying upon and from claiming or filing or causing to be filed any lien on any property, real, personal, tangible or intangible, or wherever situate, previously owned, now owned, or hereafter acquired...." because of the failure of FDIC to seek a deficiency judgment in the foreclosure action. This was the *sole* claim asserted by Jones as a basis for the action before the court in the case on appeal.

The significant fact about the complaint in this appeal is not what it alleges but what it omits. It includes no reference to the agreement signed by Jones and mailed to FDIC on October 26, 1981 by Jones' attorney, which was submitted to induce FDIC to proceed with the foreclosure, resulting some two months later in the very decree on which Jones predicates this action. Neither did it mention the action brought by Jones in 1983, some nine months after the United States Marshal had sold at public auction the property covered by the January 14, 1982 decree of foreclosure and the confirmation of the sale by the district court. It is true counsel for Jones in negotiating the agreement was Mr. Quackenbush, that the attorney who handled the later Jones action in the spring of 1983 was still another counsel, and that the present counsel for Jones did not enter this case until quite some time after the earlier action had been concluded and after the agreement of October 26 was made. But present counsel for Jones stated in the hearings before the district judge in this case that he had carefully reviewed all the record of the dealings between Jones and FDIC, so it must be assumed he knew of the prior agreement by Jones and of Jones' prior suit. And if present counsel did not know—a circumstance we find it hard to accept—his client, who was a sophisticated business man, knew intimately about these events.

Jones chose in this present complaint to be mute about the written agreement he executed and submitted to FDIC on October 26, 1981, in which he obligated himself not to assert the claim which he now brings forward in this case, or about the 1983 case filed by Jones against FDIC to compel FDIC to accept $120,000 above such sums as FDIC had received from the sale under the foreclosure decree in satisfaction of Jones' debt to FDIC and of his confession of judgment given pursuant to the 1979 agreement of the parties. FDIC, however, was not mute; it set up specifically both acts in its defensive pleadings. It even attached as an exhibit the October 26, 1981 agreement just as that agreement had been offered in evidence in Jones I by Jones himself and had been admitted then in that action as Jones' Exhibit 3 without objections from FDIC. FDIC relied on the two acts (*i.e.*, the October 26 agreement and the record in Jones I) to support its three claims in defense. First, it submitted that the agreement, represented a binding waiver barring Jones from asserting the claim he is asserting in this action. It also alleged estoppel on two grounds: (1) Jones' offer as stated in his agreement of October 26, after it had been acted on by FDIC estopped Jones from disavowing his agreement of waiver; and (2) "collateral estoppel

or judicial preclusion" arose as a result of his previous claims in this action. Finally, FDIC raised *res judicata* based on the proceedings in Jones I as a complete bar to Jones' present suit. With this understanding of the issues raised in the complaint and the defenses alleged in its answer by FDIC, we proceed to consider first, the claim of Jones as set forth in his complaint.

In the complaint herein, Jones alleges the failure of FDIC to take a deficiency judgment in the foreclosure decree as his sole present claim and he raises the claim for the first time in this action begun in mid–1986, four and a half years after the decree of foreclosure on which he grounds his present action had been entered, after the parties had engaged for months on end in negotiations, after the decree of foreclosure had been entered in efforts by Jones to compromise the very debt he now claims was satisfied by the entry of the decree of foreclosure in the mortgage foreclosure, and after Jones had spent almost three years from 1983 to 1986 prosecuting an action to enforce what he declared to be a contract to compromise the debt by payment of $120,000 above the amounts received by FDIC from the mortgage sale even though he now says that such indebtedness had been satisfied and extinguished by the earlier decree of foreclosure entered in January, 1982.

We do not understand that FDIC in its defense to this action differs with the proposition asserted by Jones that, under South Carolina law, the entry of a decree in foreclosure in which the mortgagee has neither requested nor received a deficiency judgment, *nothing else appearing*, works a legal satisfaction of the debt secured for any amount beyond that realized from the sale of the mortgaged property. *See, Sellars, supra.* Actually, that rule was understood by the parties herein before the decree of foreclosure was entered. If that constituted the bare record herein, this case could be easily resolved—Jones would be entitled to the relief he sought. However, this is not the situation presented to the court for resolution in this case, as the

statement of facts heretofore set forth makes clear.

Before the decree of foreclosure was presented to the district judge and entered on January 14, 1982, Jones had given FDIC his agreement of October 26, 1981. Both Jones and FDIC recognized in this agreement that the mortgaged property was deteriorating and that a prompt foreclosure sale was in their mutual interest. Thus, Jones, it would seem, felt that it was to his interest to have the foreclosure sale produce as much as possible for application on his debt; FDIC, on the other hand, was interested in collecting its debt. Those were the respective interests. At the same time, the parties were participating in negotiations for some sort of agreement under which Jones could possibly compromise his indebtedness which both parties understood would only minimally be liquidated by a sale of the mortgaged property. Jones had, however, a problem. His whole purpose of negotiating a compromise was, as his attorney freely conceded in the record, to avoid the recording and enforcing by FDIC of its confession of judgment against Jones. It had induced FDIC to defer filing the confession of judgment given pursuant to the 1979 agreement until the negotiations for a compromise of his indebtedness were concluded. Yet, Jones foresaw that, if FDIC applied for a decree of foreclosure in the foreclosure action, that decree would include a request for a deficiency judgment. Such action would mean that a judgment would be immediately recorded against him, even though negotiations for a compromise were proceeding. Jones represented that the filing of a judgment, whether in a decree of foreclosure or otherwise at that time would be a "serious detriment" to his financial and professional interests. He, therefore, requested FDIC to proceed with the foreclosure but to forego taking a deficiency judgment. It could be argued that FDIC really would gain nothing by withholding taking a deficiency judgment, since it already had a valid confession of judgment. To obtain another judgment by the decree in foreclosure would not add to its security. The failure to take the deficiency in the decree of fore-

closure could, however, hazard FDIC's rights to collect the balance of its debt after application of the proceeds of the mortgage sale under *Sellars, supra,* and it was unwilling to do this unless Jones protected it against this hazard by giving it a written waiver of any right to assert that its failure to take a deficiency judgment satisfied its indebtedness above the amount to be realized from the foreclosure sale. This agreement, submitted by Jones, was to protect FDIC against that very hazard. The agreement declared explicitly that Jones agreed "[t]hat FDIC may waive its rights to deficiency judgments on said mortgages without prejudicing its rights to later file the confessions of judgment" it held and that if FDIC filed its confession of judgment or "avail[ed] itself of all remedies provided at law to a judgment creditor," he [Jones] would "not raise a defense to such proceedings based upon FDIC's election to waive its rights to a deficiency judgment in this foreclosure proceeding." It was with this background that Jones signed and transmitted to FDIC the agreement of waiver on October 26, 1981.[9] It was then and then only that FDIC proceeded with the foreclosure and submitted to the decree in which it forewent taking a deficiency judgment, relying on Jones' waiver.

Under these facts, FDIC says that the October 26 agreement of Jones precludes the maintenance by him of this suit. Beyond that, it urges, as we have already said, that Jones is estopped under the circumstances under which the waiver agreement was negotiated from asserting the claim he is raising in this action. If either or both of these grounds be sound, the dismissal of Jones' action and the granting of FDIC's injunction seems compelled.

We are unable to discern in this record any valid defense by Jones to the correctness of both of these positions advanced by FDIC. The only fact that he suggests by way of answer to FDIC's first position is that the copy of the October 26 agreement

attached by the FDIC to its answer herein does not show that Banffy signed the agreement on behalf of FDIC, (he does not allege that Banffy did not sign the agreement) and that a copy of the agreement signed by Banffy had not been returned by FDIC to Jones with an acknowledgment of receipt of the agreement. It is true that the copy of the agreement attached to its answer in this action omitted Banffy's signature thereon. But that copy was the same as that offered by Jones himself in evidence as his Exhibit 3 in Jones I as a basis for his claim of estoppel against FDIC. As such it had been admitted—*on motion of Jones*—without any objection, and was treated by all parties and by the district court in Jones I as a valid and binding agreement. If there was some fraud on FDIC's part in attaching such copy of the agreement without Banffy's signature to its complaint, it would be the same fraud that Jones presumably perpetrated on the court and on FDIC when he presented for admission in evidence in Jones I a copy of the agreement without Banffy's signature on it. Beyond this there was no actual need for FDIC to sign the agreement to render the agreement valid and binding on Jones. FDIC was not bound to do anything by the agreement. The agreement was in effect an offer by Jones to FDIC that in the event FDIC in procuring a decree of foreclosure in the mortgage action forewent taking a deficiency judgment—*but only in that event*—Jones bound himself not to use that act as a defense to any action by FDIC to collect on its confession of judgment. When FDIC acted upon this offer, however, the contract fully matured and Jones became bound not to assert the ground that he now alleges as his cause of action here. FDIC's performance constituted acceptance and made it unimportant whether Banffy signed the agreement or not.[10]

However, Banffy did sign the agreement. He signed it and mailed it to his attorney a day or so after it was received so that the

---

9. Since the agreement was transmitted to the FDIC on October 26, 1981, and then accepted by FDIC, we hereafter refer to this agreement as the "October agreement."

10. Performance completes a contract and operates as an assent. Restatement (Second) of Contracts, §§ 18, 20, 45, and 53 (1979).

attorney could proceed with the foreclosure. All this is shown by contemporaneous files, which are not in dispute. Further, the failure of FDIC's counsel to advise Jones' counsel who was handling all these matters for Jones, of Banffy's signing the agreement or of mailing Jones' counsel a copy of the signed agreement is of no consequence, as Mr. Quackenbush, Jones' counsel, testified unqualifiedly herein. Thus, Mr. Quackenbush said he expected no formal notice from FDIC's counsel of Banffy's signing and that he did not expect to be furnished a signed copy. It was his testimony that when he gave FDIC's counsel the agreement, he expected such counsel to activate the foreclosure proceedings and to proceed to a final decree without a deficiency judgment—and he said that was exactly what FDIC did. The testimony of Mr. Quackenbush is clear on this. He testified that Mr. Chard, FDIC's attorney, had written him as Jones' attorney that "until he (Chard) had this agreement, Exhibit 3 (the waiver agreement of October 26, 1981), the foreclosure would not proceed." He then testified:

Q. Mr. Quackenbush, when you sent on to David Chard this document that we've identified as Exhibit 3—

A. Uh-huh.

Q. Did you expect any copy back, or—?

A. Not really. No, I didn't. I figured that—you—uh-huh.

Q. Would you take that to mean that once he received it with your client's signature, that the agreement was in place and he would go forward?

A. Yeah. I mean—I don't want you—

Q. I understand.

A. I don't want to read into this—Yes. I mean, I—I guess it has to be my recollection of what I deemed to be at that time. That when he got this form me with Al's (Jones') signature on it, that he would then go ahead with the foreclosure, which obviously is what he did.

Joint Appendix, pp. 381–82.

There is accordingly not the slightest evidence of any misleading or improper conduct of any kind on the part of FDIC in this matter. Moreover, Jones in the years since this agreement by him was executed and transmitted to FDIC has never until this suit in 1986 disavowed or sought to avoid the obligation he undertook under that agreement; in fact, as we later point out, contrary to what he has represented to be the facts in his brief filed in this court in this action, he relied on this very agreement to a substantial extent in support of his action in Jones I. Jones does insinuate there was something sinister or underhanded in the failure of FDIC to produce in Jones I the waiver agreement with Banffy's signature on it. So far as the record in Jones I shows, FDIC was not requested to produce the signed agreement. Nor was it relying on the signed waiver agreement in its defense to Jones I. It was Jones who was relying on the waiver agreement as a basis for his estoppel claim; it was Jones who proffered the waiver agreement in evidence (without Banffy's signature thereon) and secured its admission as a valid agreement binding the parties. There manifestly was no underhanded conduct by FDIC in its failure to produce the signed copy in its possession, since neither party disputed the execution of and performance by FDIC under the agreement; and Jones' attempt to give the failure to produce some improper connotation is but another instance of Jones' attempt to confuse the issues in this case and to frustrate FDIC in the collection of its debt against Jones. Certainly, FDIC had no reason to conceal the signed waiver agreement, which protected it from the very claim Jones now raises.

We, therefore, find that the agreement of October 26 was beyond all doubt a valid and binding agreement by Jones, obligating Jones not to assert the claim he makes here. Nor has Jones actually argued otherwise. He does not dispute that he signed this waiver agreement or that the agreement bound him not to assert the very claim on which he based his complaint in this action. He conceded that FDIC acted upon his promise in failing to seek a deficiency judgment in the foreclosure action. Jones is unquestionably estopped from contending to the contrary. It is settled law that when a party induces another

to take action prejudicial to his interests in reliance on a promise of that party, such party cannot later disavow his promise and obligation. The doctrine of estoppel was well phrased by the Supreme Court in *Dickerson v. Colgrove,* 100 U.S. (10 Otto) 578, 580, 25 L.Ed. 618 (1879), an often cited authority on the question:

> The law upon the subject [of equitable estoppel] is well settled. The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted.

For later expressions of the doctrine to the same effect, *see Lyng v. Payne,* 476 U.S. 926, 106 S.Ct. 2333, 2340, 90 L.Ed.2d 921 (1986); *Heckler v. Community Health Services,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984). The situation here is precisely that stated in *Dickerson.* FDIC would not proceed with the foreclosure and take a decree therein without an agreement from Jones such as he made in the October agreement. Jones executed the agreement for the purpose of inducing FDIC to waive the taking of a deficiency judgment in the decree of foreclosure. He was successful in his inducement and neither law nor common fairness will permit him to disavow and thus take an unconscionable advantage against FDIC, an advantage that would be gained by deception and unfair dealing. Courts will not tolerate such conduct. FDIC is entitled on this ground to dismissal of Jones' action before us, indeed, it is incredible that Jones would ever have filed an action in egregious repudiation of his solemn agreement.

In fact, Jones' suit is not only barred by traditional estoppel principles but also under the modern doctrine of "judicial estoppel or preclusion" as stated by us in *United Virginia Bank v. B.F. Saul Real Estate,* 641 F.2d 185, 190 (4th Cir.1981); *United States v. 198.73 Acres of Land, More or Less,* 800 F.2d 434, 436 (4th Cir. 1986), and actually cited by Jones in his brief in this Court. The doctrine, as phrased by Jones himself, is:

> In order to protect the integrity of the judicial process, litigants are barred from taking inconsistent positions in related cases, or adopting a legal position inconsistent with one earlier taken in the same or related litigation.

In *Saul,* we enlarged on this statement by offering illustrations of its applicability. We said:

> Invoking this doctrine, courts have prohibited litigants from "playing 'fast and loose,'" *Scarano v. Central R.R.,* 203 F.2d 510, 513 (3d Cir.1953), or "blow[ing] hot and cold," *Ronson Corp. v. Liquifin Aktiengesellschaft,* 375 F.Supp. 628, 630 (S.D.N.Y.1974), by barring them from taking inconsistent positions during the course of litigation.

It follows that the estoppel defense offered by FDIC, whether regarded by the standards of traditional estoppel or under those of "judicial estoppel or preclusion," was sound and warranted beyond question as a matter of law the injunctive relief sought by FDIC. Jones had consistently, until this action was filed in 1986, accepted that the agreement of October, 1981, was valid and binding and prevented the very result he seeks in this suit. He actually relied on the agreement in Jones I, offering the agreement as his exhibit and asserting it as a ground for estoppel. He sought in Jones I, filed in mid–1983, the enforcement of a compromise agreement in which the validity of the October 1981 agreement was implicitly concerned.

■ There is another ground for the result we have reached. The matter which Jones seeks to raise by his complaint is one clearly barred by *res judicata.* That doctrine has recently been stated by the Supreme Court in *Nevada v. United States,* 463 U.S. 110, 129–30, 103 S.Ct. 2906, 2918, 77 L.Ed.2d 509 (1983):

> Simply put, the doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, "[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand,

but as to any other admissible matter which might have been offered for that purpose." *Cromwell v. County of Sac*, 94 U.S. [4 Otto] 351, 352 [24 L.Ed. 195] (1877). The final "judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever." *Commissioner v. Sunnen*, 333 U.S. 591, 597 [68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). *See Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 375, 378 [60 S.Ct. 317, 319, 320, 84 L.Ed. 329] (1940).

*Res judicata*, as stated in that decision, is unquestionably established by the record before us of the action filed by Jones against FDIC in 1983 (Jones I). That record is a part of the record in this appeal. In such proceeding, begun about a year and a half after the entry of the decree of foreclosure, Jones sought specific performance of an alleged contract agreed on "[i]n the fall of 1981" under which, as Jones states it, "Jones agreed that he would pay to the FDIC an additional $120,000 over three years in full satisfaction of these debts." In a second cause of action, he alleged that, also under the contract of which he sought specific performance by FDIC, it was agreed that FDIC would not record the Confessions of Judgment given FDIC in June. Jones alleged that he had performed his obligations under that agreement but that FDIC was refusing to recognize that agreement and "may record such confession of judgment in derogation of the agreement." Jones sought under this cause of action an injunction against FDIC forbidding it from recording the "Confession of Judgment." That case was tried before District Judge Weston Houck without a jury.

At trial of that case (Jones I), Jones sought to sustain his theory of a binding agreement of compromise between the parties by contending that Banffy, the local liquidator of FDIC, had represented to Jones that, if he would submit an agreement as discussed by him with Jones on June 2, 1981, he would submit that offer to the Washington Board of Directors of FDIC for "final approval" with his (Banffy's) recommendation and that his recommendation was always approved and that, in reliance on that, Jones had executed the waiver agreement of October 26, 1981 wherein he had agreed to the foreclosure of the mortgages he had given to secure FDIC's indebtedness, had "waive[d] his rights and defenses in foreclosure actions brought by FDIC on certain properties owned by him" and had not "avail[ed] himself of his rights to appraisal proceedings under the mortgage foreclosure law of South Carolina." It is obvious from this that Jones largely based his right of action in Jones I directly on the waiver agreement executed and delivered to FDIC on October 26, 1981. It was not his position that he had not validly executed the waiver agreement nor did he dispute that such agreement did not foreclose him from asserting the very claim that constitutes the *sole* basis for the suit which is before us in this appeal. He did not argue that the waiver agreement was invalid because it had been induced by any misrepresentation that approval in Washington of the future compromise offer, if recommended by Banffy, had to be given "final approval" in Washington was a mere formality. His argument in Jones I was that the waiver agreement was valid and had been acted on by both parties and, as such estopped FDIC from disclaiming Banffy's alleged representation that "final approval" of the future compromise agreement was a "formality." [11] Jones

---

11. These charges are repeated in Jones' brief as filed with this court in appeal of the district court's decision in Jones I. *See* Vol. II, Supplemental Joint Appendix, pp. 1059 and 1061. The contention that, assuming Banffy had told Jones that his recommendations were "always" approved by Washington, Banffy's statement estopped the FDIC from failure to approve the settlement, was dismissed by us in our opinion in Jones I thus:

> Furthermore, even though Banffy's June 1981 statement that board approval would be almost automatic may have been misleading, implicit within it was the requirement that only the FDIC board could accept Jones' offer and enter into a binding agreement. Consequently, this was not a representation that Jones could have reasonably relied upon, and as a result Jones cannot make out a claim of estoppel.

made this point in his complaint in Jones I. Thus, he alleged in paragraph Eleven (b):

> The plaintiff allowed the Defendant to sell under foreclosure certain parcels of real estate which he had owned without contesting such sales even though the sale prices were well below the fair market value of the real estate.

In order to flesh out that allegation, Jones introduced into evidence the waiver agreement of October 26, 1981, as executed by Jones. FDIC did not object to such introduction and the district judge duly admitted as a part of the record as Jones' Exhibit 3 that waiver agreement. After the evidence had been concluded and the district court had filed its findings of fact and conclusions of law, Jones sought amendment of the findings of fact as we have already detailed. All of these changes were sought in order to make out Jones' claim that FDIC was estopped from denying the validity of the proposed settlement. The district judge denied the motions and let his original findings stand.

On appeal to this court, Jones reiterated his claim of estoppel based on the waiver agreement. He declared in his brief and in his claims of error that he had "adequately pled estoppel, and even if he hadn't, the court can order relief thereon." Vol. 2, Supplemental Appendix, p. 1054. He cited in his brief on appeal the language of his complaint as set forth in paragraph Eleven (b) thereof. He said repeatedly in his brief that he had "allowed FDIC to foreclose on his property without availing himself of the South Carolina Appraisal Statutes" and had "waive[ed] his rights and defenses in foreclosure actions brought by FDIC on certain properties owned by him" because he accepted Banffy's alleged representation that "final approval" by Washington was a "formality." Vol. 2, Supplemental Appendix, pp. 1056 and 1059. On appeal, we took note of the fact that Jones had refused the opportunity to press his estoppel claim, saying

the district judge also expressed regret that Jones did not attempt to show that the FDIC was estopped to deny a contract and even gave Jones the opportunity, which he declined, to present evidence supporting an estoppel theory. Seeking now to enforce his alleged 1981 agreement on an estoppel theory, Jones has appealed to this court to reverse the judgment of the district court.[12]

Despite all this, we did consider the claim of estoppel and held that "in this case Jones has not made out a traditional claim of estoppel," because he had no reason to rely on the alleged representation.[13]

Despite all this record, which clearly establishes *res judicata*, Jones in his brief in this court disingenuously declares

> And the effect of the 1981 agreement upon the confessions of judgment was not considered by Judge Houck since, as the FDIC now maintains, that agreement was not relevant to the issues in Jones.[14]

Jones cites in support of that bland statement, a colloquy on page 236 of the Appendix. The actual language of FDIC's counsel on that occasion was that

> At the last trial (*i.e.*, Jones I), they (referring to Jones) introduced a copy of the [waiver] agreement that was not signed by Mr. Jones. It was their exhibit, not our exhibit. We didn't produce an exhibit on that issue because, you know, frankly, we didn't think it was relevant.

Whatever FDIC thought on its relevancy, the agreement was admitted in evidence and Jones did rely on it as a basis for a claim of estoppel, a claim which was considered and ruled on adversely to Jones by both the district court and by us in the appeal. Equally disingenuous is Jones' belated contention that he was prejudiced because the foreclosure sales were at inadequate prices. The district judge pointed out that he had offered Jones the opportunity to offer proof along this line but Jones had declined the opportunity.[15] This shifting about on this issue as well as on the

---

12. Joint Appendix, p. 88.

13. Joint Appendix, p. 88.

14. Appellant's brief, pp. 12–13.

15. Vol. 1, Supplemental Appendix at 411.

other issues in this case was the very reason for the district court's sharp comment, already referred to herein.[16]

It is manifest from this record that the very claim which Jones now asserts in this suit was clearly available to him in Jones I and he voluntarily chose not to press it. The district court made this clear to him. He consciously refused to raise it in that case involving the same parties as does this action.[17] The standard established in *Nevada, supra,* for invoking *res judicata* is unmistakably met by the facts in this case. FDIC's motion for an injunction for the relitigating of issues that could properly have been raised and decided in the first case herein between the same parties should have been granted and the district court erred in denying it. This result is warranted not only on the basis of the October 26, 1981 agreement of Jones, and on FDIC's plea of estoppel, both traditional and judicial, but also on *res judicata.*[18]

■ Jones sought to confuse the decision in this case by injecting charges of fraud by FDIC and its counsel, which he urged tainted the judgment in Jones I. This argument had nothing to do with the sole issue raised by Jones in his complaint in this case, which was that the failure of FDIC to take a deficiency judgment in the foreclosure action worked a legal satisfac-tion of his indebtedness. These charges were raised under a strident charge of "fraud on the court" intended to direct FDIC and the court from the sole issue raised by Jones in his action. It was because of these charges, vigorously asserted by Jones' present counsel, without any formal pleading, that the district judge was diverted from deciding this case on the issues before him. The diversion was facilitated by the fact that Jones I had been tried by another district judge. For a judge, almost eleven years after the matters between the parties here became the subject of legal proceedings, to be confronted with the record of those proceedings, which had already been before two separate district judges, and to be called upon to resolve the issues in a prior proceeding was a formidable task. However, if there was a taint in the judgment in Jones I, that issue should have been raised by a Rule 60(b), Fed.R.Civ.P., motion before the district judge who had decided the earlier case and who had an intimate knowledge of the facts and decisions in the case. It is an unnecessary imposition on judicial time and administration to require a new district judge to go back over what is already well known to the district judge in the earlier case, assuming the earlier judge is available. Jones' counsel told this court during argument on this appeal that

---

16. *See* page 227, *supra.*

17. Thus, at an early stage of the trial in Jones I, the district judge, apparently cognizant of the rule enunciated in *Sellars, supra,* inquired of Jones whether under that rule, the debt of Jones had not been extinguished by the failure of FDIC to seek a deficiency judgment in the foreclosure action. His inquiry was phrased in the precise language of the *Sellars* rule:

> I mean, where is the difference? If the $650,-000 is balanced off by the land, and he gives them the land, and the mortgages on the land secures notes in the amount of $650,000, and he gives them the land, and they agree not to take a deficiency judgment, aren't they, in effect, agreeing that that land, for the purposes of this transaction, is worth the amounts of those notes, to-wit: $650,000? What's the difference?

> Counsel for FDIC promptly responded to the suggestion by quoting the language of the October 26 waiver agreement. Impressed, the district judge asked Jones' counsel if he wished to respond to FDIC's position. Jones' counsel responded that he did not wish to, preferring to move on to something more important. *See* pp. 724–25, Vol. 1, Supplemental Appendix. In the face of this record, Jones cannot fairly declare that he did not have an opportunity to raise the precise issue he seeks to raise in the subsequent Jones II case between the same parties, especially since the district court actually invited him to raise the issue and he chose to forego such opportunity.

18. The propriety of raising this issue by a motion to dismiss through injunctive relief and by motion for summary judgment has been sanctioned by us. *Fretwell v. Gillette Safety Razor Co.,* 106 F.2d 728, 729 (4th Cir.1939), *cert. denied,* 310 U.S. 627, 60 S.Ct. 978, 84 L.Ed. 1398; *Thomas v. Consolidation Coal Company,* 380 F.2d 69, 75 (4th Cir.1967), *cert. denied,* 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599, and has the approval both of 1 B Moore, *Moore's Federal Practice* § 0.408[2] (2d ed. 1984) and of 18 Wright–Miller–Cooper, *Federal Practice and Procedure,* § 4405 (1981).

he had filed such motion. The motion is not in this record and was not before the court in this action. So far as we know such motion has not been filed with or heard by Judge Houck nor has he made a

ruling on it if there is such a motion pending. Until the motion has been filed, heard and resolved, it is not a matter ripe for review by any court or relevant for review under this appeal.[19] Even if it were found binding. It is difficult to perceive how Jones can claim "fraud on the court" because FDIC did not accept his offer of compromise and execute the proposed agreement.

Another point made by Jones' counsel in his argument in support of a 60(b) motion, which, so far as the record shows, has not been filed and certainly is not a part of the record in this appeal, was that FDIC was guilty of a fraud on the court in Jones I in its alleged concealment of a power of attorney given Banffy by FDIC when he was employed. Under this power of attorney, according to Jones' attorney, Banffy had broad power to bind FDIC. First of all, such power of attorney was not concealed; it was stated in argument that the power of attorney in question herein was filed of record in most of the South Carolina counties in which the Bank had done business. That power seems merely to have authorized Banffy to satisfy mortgages given the bank when the indebtedness secured had been liquidated. As Banffy testified, without objection, it did not authorize him to *compromise* indebtedness. Banffy's authority to *compromise* indebtedness due FDIC was limited to indebtedness the face amount of which did not exceed $7,000. This limitation was stated in Banffy's formal power of attorney, approved on June 1, 1981 and effective October 1, 1981, duly proved and admitted of record herein. Appendix 1022–25. The indebtedness in this case exceeded many time this $7,000 limitation. Moreover, Banffy told Jones he did not have authority to approve the compromise offer made by Jones in his submission in December 1971. He told both Jones and Jones' attorney that "final approval" was vested with the Board of Directors of FDIC, and they understood this to be true and Judge Houck so found in Jones I and we affirmed his holding on appeal. Banffy, therefore, never signed the proposed contract of compromise settlement but mailed it to Washington with his recommendation, a fact which was undisputed in Jones I. It is manifest that Banffy had no authority to execute the contract of compromise, submitted by Jones in December, 1981. Accordingly, he did not execute the agreement submitted by Jones but, as Jones clearly understood, he forwarded it to Washington for "final approval," with his recommendation. Such recommendation was the extent of his authority. This discussion of power of attorney is, therefore, irrelevant in this appeal and represents but another attempt by Jones to confuse the facts and issues in this case in order to delay and frustrate FDIC in collecting its admitted indebtedness from Jones.

---

**19.** As stated by counsel for Jones in oral argument before the district court and this court in this appeal, the basis for his 60(b) motion (assuming it has been filed) is that FDIC perpetrated a fraud on the court in obtaining judgment in Jones I refusing specific performance of the alleged agreement to compromise. One need not review at this point the narrow circumstances under which a plea of "fraud on the court" may be sustained. We have recently discussed the limited availability of such a plea in *Great Coastal Exp. v. International Broth., Etc.*, 675 F.2d 1349 (4th Cir.1982), and *Weisman v. Charles E. Smith Management*, 829 F.2d 511 (4th Cir.1987), and will not repeat it here. However, the factual ground for such a claim by Jones appears to be that Banffy actually had authority to bind FDIC by the discussion he had with Jones and his attorney on June 2, 1981. That discussion had to do with compromising Jones' indebtedness to FDIC. Banffy stated to Jones that he lacked the authority to compromise any indebtedness due FDIC where the amount of the indebtedness exceeded $7,000, and that any such agreement required "final approval" of the FDIC Board of Directors in Washington, D.C. All this Jones and his counsel affirmed in their testimony as their understanding of Banffy's authority. Moreover, Jones fully understood this in the written offer of compromise submitted by Jones to the FDIC in December, 1981, which is the agreement which in Jones I he sought to have specific performance. *See* Vol. 1, Supplemental Appendix, p. 619 *et seq.* That agreement began by reciting Jones' indebtedness to FDIC and then said that he acknowledged that they were just debts to which he had "no setoff or other defenses to any of the obligations...." The agreement proceeded to provide that Jones would submit with the offer "true and correct" financial statements and such other financial information that FDIC might require. It also included a provision that Jones would deliver a letter of credit as evidence of good faith which shall "be drawn by FDIC at such time as FDIC accepts and executes the Agreement." Finally, the agreement states that the "Agreement ... shall be irrevocable for ninety (90) days from the effective date first above written and shall be bound if FDIC executes the Agreement in the ninety (90) day period." FDIC never executed the agreement. That is undisputed. The agreement accordingly, by Jones' own agreement, prepared and submitted to him, never became final and binding. This agreement shows beyond question that Jones understood that until FDIC executed the agreement, it would not be

to be sound, that motion would really have no bearing on the decision in this case.[20] The claim on which the present action by the plaintiff is based is completely rebutted by the October 26 agreement in which Jones, in order to induce the plaintiff to waive a deficiency judgment, had agreed that, if FDIC did waive, he would not raise such failure as a defense to the Confessions of Judgment given FDIC by Jones and would offer no defense to the enforcement of those Confessions of Judgment. After FDIC performed on its part, Jones was barred under principles of estoppel as well as his contract from prosecuting the very claim he now asserts. The denial of relief on its motion for injunctive relief and for summary judgment to FDIC by the district court is reversed and the cause is remanded along with the decision in the second appeal in this case to the district court for the entry of an appropriate order in conformity with this decision.

### III.

We turn finally to the action of the FDIC to invalidate certain conveyances which were alleged to have been made in fraud of creditors, and the motions of the two parties in that action.

In August 1986, FDIC filed suit in district court against Jones, his wife, and his father alleging that fraudulent conveyances had been made to Mrs. Jones to avoid payment of the debt owed FDIC. FDIC also filed a *lis pendens* on property owned by Jones' wife in Beaufort County, South Carolina, which it amended in September 1986. On motion of Jones, the district court dissolved the *lis pendens*, finding that the allegations of the complaint did not establish a case affecting the title to the subject property. We reverse and order that the *lis pendens* be reinstated.

Under South Carolina law, a *lis pendens* may be filed in an action "affecting the title to real property." S.C.Code Ann. § 15–11–10 (Law. Co-op. 1976). The doctrine of *lis pendens* applies to any action which directly affects real property. This includes actions which involve the question of title, and those brought to establish an equitable interest in specific real property or to enforce any lien against it. *Finley v. Hughes*, 106 F.Supp. 355, 356 (E.D.S.C. 1952). Since FDIC seeks to have the conveyances in this case declared void and its judgments declared liens on the property, the action affects real property. The action is maintainable and the *lis pendens* is valid. The order of the district court dissolving the *lis pendens* is reversed and the cause is remanded to the district court for further proceedings.

### SUMMARY

To summarize: We reverse the denial of FDIC's motions for injunction and for summary judgment in Nos. 87–3046/87–3049 and remand same to the district court with instructions to dismiss the complaints in both cases. In No. 86–3175, we reverse the order dissolving the *lis pendens* filed and remand for further proceedings in that cause.

**REVERSED AND REMANDED.**

WILKINS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the suit filed by FDIC is "an action affecting the title to real property," S.C.Code Ann. § 15–11–10 (Law. Co-op. 1976). Therefore, I concur in the reversal of the order dissolving the lis pendens and the remand for further proceedings in No. 86–3175. I also concur in the reversal of the district court

---

**20.** If Jones I were reopened for fraud and if, after the reopening Jones were to prevail in that case, the result would not be to sustain the present claim. In fact, what would be the result would be that Jones would be authorized to settle his indebtedness to FDIC by paying FDIC $120,000 and by allowing the application of the proceeds of the foreclosure sale in compromise settlement of the indebtedness of Jones to FDIC. In Jones I, Jones did not repudiate his agreement of October, 1981; he acted on the basis that it was binding and made his settlement offer of a payment of $120,000 on the assumption that the foreclosure decree with its waiver of a deficiency did not work a satisfaction or extinguishment of his indebtedness. It is obvious that even if the 60(b) motion is granted (a result we think quite remote on the record before us), it will have no effect on the result in this case.

rulings on the motions for preliminary injunctive relief in Nos. 87–3046 and 87–3049, although for different reasons. However, I dissent from the remand with instructions to dismiss Jones' action.

## I.

FDIC appeals from the order of the district court granting Jones' motion to preliminarily enjoin execution on the judgments in state court and from the denial of its motion to bar relitigation of the validity of the judgments. Appellate review of these rulings is precluded at this time by noncompliance with the requirements of Federal Rules of Civil Procedure 52 and 65.

Generally, the grant or denial of a preliminary injunction is reviewed under an abuse of discretion standard, but "[a] judge's discretion is not boundless and must be exercised within the applicable rules of law or equity." *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir.1977). Under the substantive standard of the balance-of-hardship test set forth in *Blackwelder Furniture*, the trial court must consider four factors in ruling on a request for a preliminary injunction: (1) the likelihood of success on the merits; (2) the probable irreparable injury if the injunction is denied; (3) the likely harm if the injunction is granted; and (4) the public interest. *Id.* at 196.

In addition to the substantive rules of law, the court is required to follow certain Federal Rules of Civil Procedure. Rule 52(a) provides that:

> [I]n granting or refusing interlocutory injunctions the court shall ... set forth the findings of fact and conclusions of law which constitute the grounds of its action.... It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court.

Rule 65(d) further provides that "[e]very order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained."

The district court enjoined FDIC from executing on the judgments by oral order from the bench without stating findings of fact or conclusions of law. The court also denied, without explanation, the motion of FDIC to enjoin Jones from continuing the action. The clerk of court entered a "Minute Order" denying the motion, but no additional details were provided. The district court's failure to set forth reasons for its decisions is reversible error, for the requirements of Rules 52(a) and 65(d) are mandatory. *United States v. Virginia*, 569 F.2d 1300, 1302–03 (4th Cir.1978); *Alberti v. Cruise*, 383 F.2d 268, 271–72 (4th Cir.1967); *see also Thomas v. Brock*, 810 F.2d 448, 450 (4th Cir.1987).

Jones maintains that FDIC waived the procedural requirements at the motions hearing by stating: "We just want to know if the Court planned to issue a written Order. We are not asking the Court. We feel like the verbal Order is sufficient on all the matters that the Court has decided today...." Even if the statement by FDIC's counsel can be interpreted as an attempt at waiver, it is irrelevant. Since one of the purposes of these requirements is to aid the appellate court on review, it cannot be waived by the parties unless the grounds for the court's rulings are clear from the record. *Educ. Testing Serv. v. Katzman*, 793 F.2d 533, 537 (3d Cir.1986). Here, the grounds for the district court's rulings are not clear from the record. The appropriate action is to remand to the district court with instructions to submit findings of fact and conclusions of law so that on a subsequent appeal, if there be one, this court can conduct an informed review.

## II.

This matter is before us on interlocutory appeals from the grant and denial of motions for preliminary injunctions pursuant to 28 U.S.C.A. § 1292(a) (West 1966 & Supp.1987). The majority uses these interlocutory appeals as a vehicle to address the merits of the lawsuit still at the preliminary stage of litigation and not yet ad-

dressed by the district court. Consideration of the ultimate merits is inappropriate since the district court denied FDIC's motion for summary judgment and refused to certify the issue for interlocutory appeal under 28 U.S.C.A. § 1292(b).

On interlocutory appeal, the scope of review of a grant or denial of a preliminary injunction is generally "limited to determining whether the trial court abused its discretion in finding the presence or absence of irreparable harm and a probability that the plaintiffs would succeed on the merits." *Thornburgh v. Am. College of Obst. & Gyn.*, 476 U.S. 747, 755, 106 S.Ct. 2169, 2176, 90 L.Ed.2d 779 (1986). However, plenary review may be justified where disposition of the merits "rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance." *Id.* at 757, 106 S.Ct. 2177. Here, "[a] different situation is presented [since] ... the probability of success on the merits depends on facts that are likely to emerge at trial." *Id.* at n. 8. Jones has made at least colorable claims of fraud on the court in the previous action as indicated by the district court's denial of FDIC's motion for summary judgment. And contrary to the position of the majority, these claims were properly raised in the present lawsuit. By its express terms, Federal Rule of Civil Procedure 60(b) "does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding ... or to set aside a judgment for fraud upon the court."

## III.

The requirements of Rules 52 and 65 are not mere technicalities to be enforced blindly. Rather, they are necessary for proper appellate review of district court rulings under appropriate standards. Findings of fact and conclusions of law are essential particularly where, as here, the appellate court reverses the district court and determines that the action should be dismissed on the merits. The case should be remanded for entry of findings of fact and conclusions of law.